IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| COURTNEY GABEAU, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 18-cv-2114-SMY |
| ) | |
| WILLIAM STARNES, in both his ) | |
| Individual and Official Capacity, ) | |
| FAYETTE COUNTY CIRCUIT COURT, ) | |
| and FAYETTE COUNTY, ILLINOIS , ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Courtney Gabeau filed the instant lawsuit against Defendants William Starnes, Fayette County Circuit Court, and Fayette County, Illinois, asserting violations of Title VII, the Illinois Human Rights Act ("IHRA"), and the Equal Protection Clause of the Fourteenth Amendment. Defendants move for summary judgment (Doc. 75), which Gabeau opposes (Doc. 76). For the following reasons, Defendants' Motion is **GRANTED**.

### Factual Background

Construed in the light most favorable to Gabeau, the evidence and reasonable inferences establish the following facts relevant to the pending summary judgment motions: Courtney Gabeau was hired as the deputy felony clerk in the Fayette County Circuit Clerk's Office in August 2015 (Doc. 75-1, p. 35, p. 41). Her job duties included creating files, filing motions, updating all criminal records in the Judicial Information Management Services ("JIMS") and attending the criminal court calls. *Id*. at pp. 35-36. Defendant William Starnes was appointed Fayette County

Public Defender in September 2016 and began work in that position on November 1, 2016. (Doc. 75-5, p. 16). Gabeau was transferred to the public defender's office on December 1, 2016, where she worked as Starnes' secretary. *Id.*

Gabeau alleges she was sexually harassed by Starnes on four occasions; December 13, 2016, January 4, 2017, February 6, 2017, and February 15, 2017. She kept a running ledger of the comments titled "Inappropriate comments made by William B. Starnes to his secretary" and made an entry after each comment. She used her work computer but kept the document on a flash drive so that it would not be found on the hard drive (Doc. 75-1, pp. 134-137, 140-141). Gabeau's father advised her to keep the ledger until the situation reached a point where she needed to report the comments. *Id*. at pp. 136-137, 142-143, 152.

Gabeau made the following entry to the ledger on December 13, 2016 (Comment #1):

> "On my desktop background for my work computer, I have a picture of my boyfriend and I at his dad's house for Thanksgiving. William was standing behind me waiting for his coffee to brew and he said, 'It looks like you're taking it from behind,' referencing the background picture. My response was 'no, that is definitely not what it looks like or it that what's happening.'" (Doc. 75-8; Doc. 75-1, p. 138).

According to Gabeau, after her response, Starnes "looked like a deer in headlights" and walked away. *Id*. He never made another comment about the photo. *Id*. For the next three weeks, Starnes and Gabeau had normal and civil work-related conversations without inappropriate comments or incidents. *Id.,* pp. 143-144.

The following entry was made on January 4, 2017 (Comment #2):

> "William Starnes has come in from the courtroom into our office. On the case file, I have wrote "FAWC/PH", which stands for first appearance with counsel/preliminary hearing. This acronym is used in the Circuit Clerk's office and also in the Judge's docket entries. William looked at me from the doorway and said, 'we need to find a different saying because this sounds like fuck, and I didn't know if that was an invitation or not.' My response

> was 'no that was not and that was inappropriate.'" (Doc. 75-8; Doc. 75-1, p. 145).

Starnes never brought up this topic again and he and Gabeau had professional work-related conversations until the next incident occurred on February 6, 2017 (Doc. 75-1, pp. 154-155) (Comment #3):

> "William Starnes and I were discussing a client and his place of employment at PETCO in St. Elmo, Illinois. I explained to William that my boyfriend's father was employed at PETCO until he broke his back and further explained that he tore his abdominal wall. The doctors repaired his abdomen and the joke in the family is that we refer to his stomach as an alien. After I finished my explanation, William Starnes made the comment, 'I can't imagine having sex with that,' and my response was, 'um, no, that was inappropriate, and I don't want to know that!'" (Doc. 75-8, Doc. 75-1, pp. 155-156).

Nine days later (February 15, 2017), Gabeau made the following entry (Comment #4):

> "William Starnes at 8:25 a.m. closed our office door and said, 'I need to ask you a question.' I proceeded to answer, 'Okay, what's up?' William leaned over the chair and asked me, 'Do you have a thing going on with Judge Sheafor?' My response was, 'No, I do not! Judge Sheafor always says hi, how are you, ever since I have worked here, which was two years. From being in the courtroom every day for six months with Judge Sheafor, we always converse with one another. But no there is nothing going on between him and I.' William's response was 'I did not figure there was, but I wanted to ask, beings that this is [Judge Sheafor's] third time in the last eight days coming to our office to say hi.' I just stared at him with no response" (Doc. 75-8; Doc. 75-1, pp. 169-170).

The February 15, 2017 incident was the "straw that broke the camel's back" and Gabeau reported the incidents to Circuit Clerk Kathy Emerick. (Doc. 75-1, p. 172). Emerick called Victim Witness Coordinator Kira Palmer and County Clerk Vicki Conder (Doc. 75-3, pp. 108-109; Doc. 75-4, pp. 54-55; Doc. 75-9, p. 44; Doc. 75-12, p. 15). Gabeau gave a copy of her ledger to Conder (Doc. 75-1, pp. 188-89), and Conder contacted Sheriff Chris Smith and gave him the ledger (Doc. 75-9, pp. 46-47).

Sheriff Smith, Chief Deputy Larry Halleman, Joshua Morrison, and Judge M. Don Sheafor met, reviewed the allegations, and discussed what to do (Doc. 75-2, ¶¶ 50-52). They then met with Gabeau to interview her about the incidents (Doc. 75-1, pp. 194-196). Gabeau told the group that Starnes did not touch her and stated that if he had, "this would have been an entirely different conversation and …I would have kicked him in the balls." (Doc. 75-1, p. 191). The group discussed Starnes' comments, confirmed no touching had occurred and agreed to send Gabeau home with pay while they investigated (Doc. 75-1, pp. 198-201; Doc. 75-6, pp. 67-68, 79-80, Doc. 75-2, ¶54).

The next day, Judge Sheafor interviewed Gabeau while Halleman took notes (Doc. 75-2, ¶¶ 55-65). After the interview, Judge Sheafor asked Emerick and Conder if there were openings in any county offices, but neither had openings (Doc. 75-2, ¶¶ 65-69). Judge Sheafor asked Conder if she could put Gabeau to work on a temporary basis while the investigation was pending and reiterated that it would not be a permanent position; Conder agreed (Doc. 75-2, ¶¶ 70-71; Doc. 75-9, p. 61). Judge Sheafor told Gabeau to report to work in the County Clerk's office on Monday (Doc. 75-2, ¶ 72). Gabeau knew the placement in the Clerk's office was temporary (Doc. 75-1, pp. 88-89; Doc. 75-3, p. 40; Doc. 75-7, pp. 31-32). Her pay remained the same (Doc. 75-1, pp. 80-83).

The investigation was referred to Chief Judge Kimberly Koester's Office because Judge Sheafor, the resident judge, was named in the allegations (Doc. 75-7, p. 24). Judge Koester reviewed the sexual harassment policies from the County and Illinois Supreme Court to prepare for her investigation. (Doc. 75-3, pp. 19-20). She spoke to Morrison, Smith and Judge Sheafor and interviewed Gabeau, Starnes, Emerick and Pearson (Doc. 75-3, pp. 47-48; Doc. 75-7, pp. 42-43). Judge Koester testified that the comments, as a whole, could have been construed as

inappropriate and falling under paragraph 5 of the County's Policy against Discrimination, Harassment and Sexual Misconduct, which states:

> Each employee must exercise his or her own good judgment to avoid engaging in conduct that may be perceived by others as sexual harassment or harassment based on any status protected by law. The following are illustrations of action that Fayette County deems inappropriate and in violation of our policy: … (5) Verbal conduct such as making or using derogatory comments, epithets, slurs, sexually explicit jokes, derogatory or suggestive comments about a person's body or dress.

(Doc. 75-3, pp. 15, 48-49; Doc. 75-7, pp. 33-34, pp. 51-52). After she completed the investigation, Judge Koester told Starnes that his discipline would be (1) a written reprimand to be placed in his file, and (2) the completion of a job sensitivity training within 90 days, and that she would consider the matter closed upon completion of his training (Doc. 75-3, p. 71; Doc. 75-7, pp. 49-51).

There was no other office space available in the courthouse for Gabeau (Doc. 75-7, p. 55) and there were no other positions available in the County (Doc. 75-1, pp. 59-62; Doc. 75-3, pp. 87-88; Doc. 75-2, ¶¶ 66-69). Gabeau told Judge Koester that she did not want Starnes walking behind her because that is when he saw her computer screen (Doc. 75-7, p. 55). Judge Koester decided that the coffee maker would be moved from behind Gabeau's desk to avoid Starnes having to walk behind her to get coffee, and Starnes was required to leave the door to the hallway open at all times (Doc. 75-7, p. 52).

Judge Koester informed the judges in the Fourth Judicial Circuit of the outcome of the investigation and the steps taken (Doc. 75-3, p. 65). She then shared the results of her investigation with Gabeau and told her she could return to the Public Defender's office (Doc. 75-1, pp. 84-85; Doc. 75-3, p. 67; Doc. 75-7, pp. 52-53). Gabeau did not feel comfortable or safe working with Starnes and she resigned two days later. (Doc. 75-1, pp. 59-60; Doc. 75-24).

## Discussion

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party is entitled to summary judgment where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

### Sexual Harassment Under Title VII and IHRA

Title VII prohibits employers from discriminating against any individual because of the individual's sex. 42 U.S.C. § 2000e-2(a)(1). To prevail on a sexual harassment claim, a plaintiff must prove that "(1) her work environment was objectively and subjectively offensive, (2) the harassment she complained of was based on her gender, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018); *accord Passananti v. Cook Cty.*, 689 F.3d 655, 664 (7th Cir. 2012).

The third element – severe or pervasive conduct – has an objective and subjective component. *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008). The plaintiff may satisfy the subjective component by presenting evidence that she in fact perceived her workplace as hostile or abusive. *Id.* The objective component entails an examination of the totality of the circumstances. *Id.* More specifically, "[d]eciding whether a work environment is hostile requires

consideration of factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)); *see also*, *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). Under this standard, employers generally do not face liability for off-color comments, teasing, isolated incidents, and other unpleasantries that are, unfortunately, not uncommon in the workplace. *See Passananti*, 689 F.3d at 667; *Swyear*, 911 F.3d at 881-82.

Although unquestionably sexist, offensive, and frankly disgusting, Starnes' comments, even when taken together, do not rise to the level of actionable harassment under prevailing Seventh Circuit standards. He made the comments sporadically, he never made any physical contact with Gabeau or explicit invitations for sex, and he was not physically threatening. Courts in this Circuit have found comments that were more sexually explicit and offensive than those alleged by Gabeau not sufficiently severe to create a hostile work environment. For example, in *Baskerville v. Culligan International Co.,* 50 F.3d 428, 430 (7th Cir. 1995)*,* the Seventh Circuit held that the alleged perpetrator calling the plaintiff "pretty girl"; grunting when she wore a leather skirt; suggesting she heated up his office; telling her that a P.A. system "attention" announcement meant that "All pretty girls run around naked"; implying that "pretty girls" at the office might make him "lose control"; insinuating that she and he had been "dancing, like in a night club"; and mentioning that it was lonely in his hotel and stating, with a gesture suggesting masturbation, that all he had for company was a pillow, was not actionable sexual harassment. *Baskerville,* 50 F.3d at 430; s*ee also Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713-14 (7th Cir. 2017). Starnes' comments are "more reflective of run of the mill uncouth behavior than an atmosphere permeated

with discriminatory ridicule and insult." *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005); *see also Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005) (affirming summary judgment where the evidence presented a handful of comments of a sexual nature, which were neither serious nor threatening).

Gabeau argues that Title VII and IHRA sexual harassment claims are analyzed differently. Her argument, however, is at odds with relevant case law. Illinois courts have adopted the test established under Title VII for determining when conduct creates a hostile work environment sufficient to sustain a finding of sexual harassment under the IHRA. *See Polychroniou v. Frank,* 2015 WL 7429318, at *7 (Ill. App. Ct. Nov. 20, 2015) ("The prohibition of sexual harassment found in the Illinois Human Rights Act 'closely parallels' Title VII of the Civil Rights Act ... and, therefore, examination of federal Title VII law is appropriate."); *see also, Frey v. Coleman*, 141 F. Supp. 3d 873, 879 (N.D. Ill. 2015) (stating that "[t]he requirements to make out a sexual harassment claim under the IHRA are substantially the same" as those under Title VII). In particular, the aggrieved employee must present evidence that the respondent engaged in behavior (1) that was severe or pervasive enough to create a work environment that a reasonable person would find to be hostile or abusive. *See Cook Co. Sheriff's Office v. Cook Co. Com'n on Human Rights*, 53 N.E.3d 1144, 1153 (Ill. App. 2016).

As previously noted, Starnes' comments cannot be considered severe or pervasive as a matter of law. Accordingly, the Defendants are entitled to summary judgment with respect to Gabeau's Title VII and IHRA sexual harassment claims.

## Equal Protection Under 42 U.S.C. § 1983

Defendants also seek summary judgment on Gabeau's § 1983 equal protection claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Under *Monell*, a municipality may

be liable under 42 U.S.C. § 1983 if (1) it had an express policy calling for constitutional violations, (2) it had a widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law, or (3) if a person with final policymaking authority for the municipality caused the constitutional violation. *Id.* at 694. In other words, a municipality is liable only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," is the moving force behind the constitutional violation. *Id.* at 694. The elements of a hostile environment under Title VII and the Equal Protection Clause are the same. *Silva v. Wisc.*, 917 F.3d 546, 559 (7th Cir. 2019) ("We evaluate discrimination claims brought under both Title VII and § 1983 using the same standard.").

Here, there is insufficient evidence from which a reasonable jury could find actionable sexual harassment. First, absent an underlying constitutional claim against Starnes, Gabeau may not proceed on her *Monell* claim. *Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000). Moreover, there is no evidence of a municipal policy or practice of supporting a hostile work environment based on sex or that Starnes was a person with final policymaking authority for the County. As such, Defendants are also entitled to summary judgment on Gabeau's § 1983 claim.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment accordingly and to close this case.

**IT IS SO ORDERED.**

**DATED: August 3, 2020**

**STACI M. YANDLE**
**United States District Judge**